# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00191-CR**
**NO. 09-17-00192-CR**
**NO. 09-17-00193-CR**

_____

**PETER EDWARD DOLAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

___

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 15-12-13417-CR, 16-07-07767-CR & 17-03-03063-CR**

___

**MEMORANDUM OPINION**

A jury found Peter Edward Dolan (Dolan or Appellant) guilty on three counts

of aggravated sexual assault of a child, including two counts as to his niece, A.S.,

and one count as to his niece, N.G.[1] *See* Tex. Penal Code Ann. § 22.021(a)(1)(B),

___

[1] We identify the victims and certain witnesses by using initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with dignity and privacy throughout the criminal justice process").

1

(2)(B), (f)(1) (West Supp. 2017).[2] The jury assessed punishment, and the trial court sentenced Dolan to life imprisonment for each count, with the sentences to run concurrently. Dolan appeals. We affirm the judgments of conviction.

## The Indictment

In cause number 15-12-13417-CR, a grand jury indicted Dolan for aggravated sexual assault of a child and alleged that

> . . . Peter Edward Dolan, on or about December 25, 2014, . . . did then and there intentionally or knowingly cause the penetration of the sexual organ of A.[]S., a child who was then and there younger than 14 years of age[.]

In cause number 16-07-07767-CR, a grand jury indicted Dolan for aggravated sexual assault of a child and alleged that

> . . . Peter Edward Dolan, on or about December 30, 2014, . . . did then and there intentionally or knowingly cause the penetration of the sexual organ of A.S., a child who was then and there younger than 14 years of age[.]

In cause number 17-03-03063-CR, a grand jury indicted Dolan for aggravated sexual assault of a child and alleged that

> . . . . Peter Edward Dolan, on or about December 30, 2014, . . . did then and there intentionally or knowingly cause defendant's hand and/or finger to penetrate the sexual organ of N.G., a child who was then and there younger than 6 years of age[.]

---

[2] In this Memorandum Opinion, we cite to the current versions of statutes if the subsequent amendments do not affect the outcome of this appeal.

2

The Evidence[3]

<u>Testimony of Director at Children's Safe Harbor</u>

Kari Prihoda, the client services director at Children's Safe Harbor and designated by the trial court as an outcry witness for A.S., testified that she conducted the forensic interviews with A.S. and N.G. on October 2, 2015. Prihoda testified that at the time of A.S.'s interview, A.S. was eight years old. According to Prihoda, she established a rapport with A.S., A.S. promised to tell the truth, and Prihoda determined that A.S. knew the difference between the truth and a lie. Prihoda testified that A.S. told her that A.S.'s "Tio Peter[,]" whom she called "Peter, Jr." and who used to live with her grandmother, on more than one occasion had "pok[ed] [A.S.] in her middle part[,]" and that A.S.'s "mom calls that the vagina." According to the trial record, A.S. identified what she meant by "middle" on a drawing of a female child by circling the female sexual organ.

Prihoda testified that A.S. told her that one of the occasions was "last Christmas[]" when A.S. and her uncle were watching television on the couch in the living room of her grandmother's house, and her uncle or "Tio Peter" grabbed a green and white polka-dot blanket from the couch and covered himself and A.S.

---

[3] We have limited our summary to testimony and evidence from the guilt-innocence phase of the trial.

According to Prihoda, A.S. explained that the only people in the room were Peter, A.S., and A.S.'s cousin, N.G., and that A.S. told Prihoda that she was wearing a My Little Pony shirt, black pants, and underwear with pandas on them that day. A.S. stated that Peter "poked her" with his finger and "went in there . . . through [her] underwear[]" and it hurt.

A.S. also told Prihoda about another incident that happened at Walmart when A.S. and N.G. went into the restroom and Peter waited outside. A.S. reported that when they left the restroom, Peter directed them back into the restroom, pulled their pants down, "poked [them,]" that he had poked A.S. "in a little hole . . . it hurt a lot[,]" and that he had poked them with his finger. A.S. told Prihoda that A.S. watched Peter "poke" N.G. in her middle, that N.G. made a mean face and said "Ouch, it hurt[]" and "Stop." According to Prihoda, A.S. stated she was wearing shorts with flowers on them and underwear with stars, and that N.G. was wearing black pants, a shirt with a panda on it, and underwear with rainbows.

A.S. told Prihoda about another incident that happened in the car as A.S., A.S.'s cousin, P.J., A.S.'s grandmother, Peter and "Tia Della" were leaving A.S.'s grandmother's house. A.S.'s grandmother and "Tia Della" were in the front seat, and A.S. and P.J., who was asleep, were in the back seat with Peter. A.S. described her clothing that day as shorts with sparkles on them and a shirt with a cat and a little

4

boy on it. A.S. told Prihoda that Peter touched her, poked her with his finger on top of her skin, and then took his hand out of her shorts. A.S. told her that Peter was the only person she felt unsafe around and that Peter on one occasion told A.S. that only he could touch her there.

Testimony of A.S.

A.S., who was nine years old at the time of trial, testified[4] that her Uncle Peter, "touched [her] somewhere he wasn't supposed to[]" on three occasions, but she could not remember the order in which they occurred. A.S. testified that one of the instances happened when she was on her way home from her grandmother's house during the daytime and her aunt was driving, A.S.'s grandmother was in the front seat, and A.S. was in the back seat of the car and sitting between Dolan and her two-year-old cousin. According to A.S., Dolan put his hand under her shorts but over her underwear and was "feeling around[]" her "ka-ka." When asked at trial what her "ka-ka" was, A.S. said her mother taught her that word and A.S. identified that it was the part of her body that she circled on a drawing of a girl on one of the State's

---

[4] The trial court held a hearing to evaluate A.S. for competency pursuant to Rule 601 of the Texas Rules of Civil Evidence, and the court and both parties participated in the examination. The trial court determined that A.S. was competent to testify.

exhibits, and the trial court took judicial notice that A.S. identified the female genitalia on the exhibit.

A.S. testified that, on another occasion, she went to Walmart with Dolan and her cousin, N.G., to get ice cream. According to A.S., Dolan was driving his red truck and she and N.G. were sitting in the back seat. A.S. testified that after they picked out ice cream, she and N.G. went into the Walmart girls' restroom while Dolan stayed outside. After they used the restroom, washed their hands, and exited the restroom, Dolan told A.S. and N.G. to go back inside the restroom and the girls went back in. According to A.S., no one else was in the restroom and Dolan, A.S., and N.G. went into the "big stall" in the back of the restroom and he pulled A.S.'s and N.G.'s shorts down and "poked" A.S.'s "ka-ka" outside of her underwear. A.S. testified that she did not know if anything happened to N.G. because A.S. was pulling up her shorts, but she explained that N.G. looked mad "[b]ecause probably he touched her, and she didn't like it." On cross-examination, A.S. agreed that she was not sure at which Walmart the touching occurred, and she testified "it may have happened somewhere else, but I don't know."

A.S. testified that on a third occasion, she was spending the week at her grandmother's house around Christmas, and she was on the couch in the living room watching television and Dolan "touched [her] on [her] ka-ka" and "poked it and then

6

he slid [his index finger] out[.]" According to A.S., her cousin P.J. was in the room, her grandmother was in the kitchen, and lots of people were outside because they were having a party outside. A.S. testified that it hurt and she moved to another couch.

A.S. explained at trial that at first she did not tell anyone about the instances because she thought they would be mad at her. A.S. testified that Dolan told her that what he was doing was "a secret." A.S. testified that one day "[b]ecause [N.G.] told[,]" A.S. decided to tell her mother that Dolan had touched her and she told her about the three instances. A.S. was unable to identify Dolan in the courtroom.

Testimony of Victim Assistant Coordinator

Ilda Rupert, a victim assistant coordinator with the Montgomery County District Attorney's Office and a proper outcry witness for N.G. as designated by the trial court,[5] testified that she, along with a prosecutor and an investigator, met with N.G. on January 30, 2017, as a trial date was approaching. According to Rupert, N.G. would have been about four years old at the time of the meeting, and due to N.G.'s speech impairment, they showed N.G. an anatomical drawing because it "seemed easier" to communicate with N.G. using the drawing. N.G. told them that

---

[5] The trial court also found Kari Prihoda was a proper outcry witness for N.G., but Prihoda did not testify regarding N.G.'s outcry.

"Uncle Peter touched me right here[,]" and she pointed to the female sexual organ on the drawing of the little girl. Rupert testified that when N.G. was asked what Peter touched her private part with, N.G. answered "[w]ith his hand[,]" and said "[h]e did like this" while indicating that he had moved four fingers to the front and back of her female sexual organ multiple times. According to Rupert, N.G. told them that this happened at "Mo-Mo's house in the green room[]" with the lights off. N.G. drew a picture for them of where it happened and explained the picture as showing her and her younger cousin P.J. lying in bed with Peter lying next to N.G.

Rupert testified that she met with N.G. again on March 28, 2017, and N.G. reiterated clearly that at Mo-Mo's house Dolan touched her under her clothes and inside her "private part[.]" According to Rupert, she met another time with N.G. for about fifteen minutes on May 12, 2017, when N.G. was five years old. Rupert testified that, at all three meetings, N.G. was consistent in describing the abuse that occurred in the green room at Mo-Mo's house.

Testimony of N.G.

N.G. testified[6] that she is five years old. At trial, she circled two areas on a drawing of a little girl without clothes and identified those two areas of her body as

---

[6] On the defense's motion, the trial court evaluated N.G. for competency. The trial court held a hearing pursuant to Rule 601 of the Texas Rules of Evidence, and

areas that no one should be allowed to touch, which she referred to as her "ka-ka" and her "butt." Although she initially testified that no one had touched her "ka-ka" she subsequently testified that she remembered telling the prosecutor that her Uncle Peter touched her "ka-ka." N.G. testified that when Dolan put his hands in her "ka-ka[,]" Dolan, N.G. and P.J. were in the green room. According to N.G., Dolan put his finger in her "ka-ka[,]" moved his finger, and took it out. However, when asked if anyone had ever touched her body where she did not want to be touched or if anyone had ever touched her "ka-ka" against her wishes, she answered, "No." N.G. was unable to identify Dolan in the courtroom at trial.

Testimony of A.S.'s Mother

J.L., A.S.'s mother, testified that M.L. and N.G. came over and M.L. expressed something to J.L. that caused her concern. According to J.L., N.G. then pointed to her "private part," and then A.S. looked nervous and said something. J.L. waited for her husband to come home, told him what had happened, texted her sister (Peter's wife, Della) and told her to meet them at their mother's house. After J.L. and M.L. talked to Della, Della sat down, called Peter, and began crying. According to J.L., someone called the police, and J.L. gave the police a statement when they

---

the court and both parties participated in the examination. The trial court determined that N.G. was competent to testify.

9

arrived. Although the police did not talk to the children, a detective later contacted J.L. and asked her to bring A.S. in for a forensic interview. A.S. also had a medical exam.

Testimony of M.L.

N.G.'s mother, M.L., testified that Dolan is the husband of one of her sisters and that J.L., A.S.'s mother, was her other sister. M.L. explained that N.G. was five years old at the time of trial and that A.S. is her niece. M.L. testified that from 2013 to 2015 that Dolan and her sister lived with M.L.'s parents and that N.G. would go to M.L.'s parents often and that N.G. would have been around Dolan "[t]oo many times to count."

M.L. testified that about two weeks before the Walmart incident she was giving N.G., who was three years old at the time, a bath at M.L.'s house and N.G. told her something that made her concerned. She waited a couple of nights, talked to J.L. about what M.L. learned from N.G., and then M.L. arranged a meeting at her mother's house and called the police. M.L. testified she gave the police her written statement. According to M.L., within the month before N.G.'s outcry, Dolan had asked to take N.G. and A.S. to the zoo, and M.L. was concerned and did not let him take N.G. M.L. remembered an evening Christmas party in 2014 at M.L.'s parents house that lasted until the early hours of the next day, and the adults and children

10

were going inside and outside during the party. M.L. also testified that before N.G.'s outcry, they discovered N.G. had been acting out sexually with her best friend who was about N.G.'s age.

Testimony of Detective Acosta

Shannon Acosta, a detective with the Montgomery County Sheriff's Office who investigates crimes against children and who was assigned to the case, testified that a patrol report was called in on September 24, 2015 regarding the case. Acosta testified that she contacted N.G.'s mother and Acosta scheduled forensic interviews for A.S. and N.G. on October 2, 2015. According to Acosta, after she observed the forensic interviews she began investigating Dolan on the charge of aggravated sexual assault of a child in regards to A.S. and on charges of "[i]ndecency with a child and possibly aggravated sexual assault of a child[]" in regards to N.G. According to Acosta, the girls had sexual assault nurse examiner (SANE) exams on October 6, 2015, and the SANE charts that Acosta reviewed corroborated what was said during the forensic interviews. Acosta requested a list of specific clothing in an attempt to corroborate details she learned from the forensic interview, and although she was unable to collect the clothing she did receive pictures from around Christmas time of 2015 of A.S. wearing the specific clothing that she described she was wearing during one of the offenses. Acosta also met with the girls' grandmother.

Ultimately Acosta presented the case to the District Attorney's Office and filed a warrant for Dolan's arrest for aggravated sexual assault of a child. According to Acosta, in her experience investigating crimes against children, children are "not very good with dates[,]" and adults are "[n]ot the best with them either." Acosta also explained that "[d]isclosure is a process, so it can take more than one time for [children] to remember different things or more details or be able to describe more details."

Testimony of SANE

The SANE testified that she examined N.G. and A.S. at Children's Safe Harbor on October 6, 2015. The SANE testified that her notes for the history provided by N.G. state that N.G. reported that "Uncle Bear, he touches down there[,]" but the SANE also clarified in her notes that N.G. had difficulty with pronunciation and pronounced the letter "P" as the letter "B[.]" According to the SANE, N.G. indicated that there had been touching to her genitalia. The SANE concluded that because N.G. was unable to clarify the type of touching, the SANE could not determine whether there had been penetration. According to the SANE, no genital exam was conducted because N.G. would not remove her clothing, and no evidence would have been collected because the reported touching was outside the 96-hour window prior to the date she examined N.G.

12

As to the SANE's examination of A.S., the SANE testified that her notes stated that A.S. reported to her that "My Uncle Peter, he pokes me in my middle part with his finger . . . He did it when I was in the car, he did it when I was at my grandmother's living room. She was washing dishes. It hurt when he did it. He did it three times. One time I was at Walmart in the bathroom. He just pulled down my pants, and he just poked me[.]" The SANE testified that A.S. was unable to give her a date of the assault, but that no evidence was collected because it had been more than 96 hours since the assault had occurred. According to the SANE, during her genital assessment of A.S. she found no injuries, which is common and consistent with the type of touching reported by A.S. The SANE testified that she determined that penetration to the female sexual organ had occurred with A.S., and that the SANE based that determination on A.S.'s choice of words and where A.S. identified on her genitalia touching occurred when the SANE was doing the genital assessment.

Testimony of Children's Safe Harbor Therapist

Teresa Swain, a bilingual staff therapist for Children's Safe Harbor testified that N.G. and A.S. began counseling sessions at Children's Safe Harbor in October of 2015. According to Swain, N.G. did not graduate from the counseling program at Children's Safe Harbor because N.G. was unable to attend due to family

13

transportation issues, but A.S. graduated and was discharged. Swain testified that, according to treatment notes, N.G. reported the touching by Peter at a counseling session to her initial therapist, and at another subsequent session with Swain. According to Swain, in her treatment of A.S., she helped A.S. with symptoms such as difficulty in school, extreme sadness, trouble sleeping, heightened anxiety, and stomachaches, and that these are symptoms that are associated or heightened in cases of children who have experienced trauma. Swain testified that A.S. indicated to her that she was in fear of Dolan but had mixed emotions because she was angry at Dolan about the touching but still loved him. Swain testified that A.S. felt a lot of shame and guilt and reported to Swain that she had difficulty sleeping and would wake up thinking about the alleged abuse. Swain testified that A.S. did not want to talk about the alleged abuse because she was embarrassed and Swain believed A.S. felt she was betraying Dolan. According to Swain, at one counseling session A.S. explained that she did not feel safe because she had been tricked by Dolan and she was frightened that he might have access to her again. A.S. also reported to Swain that Dolan told her not to tell about the touching and that it was their secret. Swain testified that her treatment notes indicated that A.S. identified as one of the scariest moments of the alleged sexual abuse the instance when she was sitting in the back

14

seat of a car with Dolan and he put a blanket over them and digitally penetrated her vagina while two female relatives were in the front seat.

Defense Motion for Directed Verdict

After the State rested, the defense made a motion for directed verdict which was overruled by the trial court. The defense called no witnesses.

## Appellate Issues

In his first appellate issue, Dolan challenges the sufficiency of the evidence supporting his convictions. In issue two, he argues the trial court erred in designating Prihoda as the proper outcry witness for A.S. and Rupert as the proper outcry witness for N.G. In issue three, Dolan contends the trial court committed harmful error by allowing leading questions and prejudicial testimony over trial counsel's objections.

## Sufficiency of the Evidence

In his first issue, Dolan challenges the legal and factual sufficiency of the evidence supporting his convictions and asserts that the trial court should have granted Dolan's motion for directed verdict. Specifically, Dolan argues that the State failed to establish (1) when the alleged Walmart offense involving A.S. occurred, (2) that N.G. was at Mo-Mo's house on or about December 30, 2014, and (3) a time frame or location for the extraneous offense against A.S. that allegedly occurred in the back seat of a vehicle. Additionally, Dolan asserts that A.S.'s and N.G.'s

testimony and allegations are "quite simply too fantastical for a reasonable juror to believe." According to Dolan, the State also failed to prove that the touch and penetration was by Dolan and not by N.G.'s three-year-old playmate or N.G. herself.

A person commits the offense of aggravated sexual assault of a child younger than fourteen years old if he intentionally or knowingly causes the penetration of the sexual organ of the child by any means. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B), (2)(B).[7] In reviewing the sufficiency of the evidence to determine whether the State proved the elements of the offense beyond a reasonable doubt, we apply the *Jackson v. Virginia* standard. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under that standard, a reviewing court must consider all the evidence in the light most favorable to the verdict and in doing so determine whether a rational justification exists for the jury's finding of guilt beyond a reasonable doubt. *Id.* at 902; *see also Jackson*, 443 U.S. at 319. As the trier of fact, the jury is the sole judge of the weight and credibility of the witnesses' testimony and on appeal we must give deference to the jury's determinations. *Brooks*, 323 S.W.3d at 899, 905-06. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the

---

[7] Additional acts constitute aggravated sexual assault, but for brevity, we only refer to the statutory act charged in this case.

16

verdict and defer to that resolution. *Id.* at 899 n.13 (citing *Jackson*, 443 U.S. at 319). On appeal, we serve only to ensure the jury reached a rational verdict, and we may not substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In our review, we consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

We first address Dolan's arguments that the State presented no evidence as to when the Walmart offense occurred, and offered no evidence "that N.G. was visiting or staying at Mo-Mo's house" around December 30, 2014 when the offense in the "green room" allegedly occurred. The indictments for such offenses alleged that the incidents occurred "on or about" two specific dates in December 2014, occurring prior to the presentment of the indictment. "It is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). In this case, the testimony established that the incidents of abuse at the Walmart and in the "green room" occurred anterior to the indictment, and there is no statute of limitations for the offense of aggravated sexual assault of

17

a child. *See* Tex. Code Crim. Proc. Ann. art. 12.01 (West Supp. 2017). As for Dolan's argument that the State failed to prove the time frame for the extraneous offense in the car, Dolan was not being tried for that offense and the jury could decide whether the testimony regarding the extraneous offense was credible.

The jury heard Kari Prihoda, an outcry witness for A.S., testify that when she interviewed A.S., A.S. reported that Dolan on three different occasions had poked her "in a little hole" in her "middle part[,]" which her mother called the vagina, and that it hurt. The jury heard Prihoda's testimony regarding the details of the offenses (such as location, time frame, who was nearby, what A.S. was wearing, and Dolan's actions) as reported to her by A.S., and the jury heard the details regarding the offenses against N.G. during N.G.'s own testimony at trial.

The jury also heard Ilda Rupert, an outcry witness for N.G., testify that when she met with N.G., N.G. reported to her that Dolan had touched her under her clothes and inside her private part when they were at "Mo-Mo's house in the green room." The jury heard Rupert's testimony regarding the details of the offense against N.G. (such as location, time frame, who was nearby, what N.G. was wearing, and Dolan's actions) as stated by N.G., and the jury heard the details regarding the offense against A.S. during A.S.'s own testimony at trial. The jury also heard the testimony of the

18

therapist who treated the girls after the offenses, the testimony of the SANE assigned to the case, and the testimony of the girls' mothers.

The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for aggravated sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (West Supp. 2017) (a child's testimony alone is sufficient to support a conviction for aggravated assault when the child is under the age of seventeen at the time of the alleged offense); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).

The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not believe the witnesses, or any portion of their testimony, despite contradictory evidence. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974)). Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could find, beyond a reasonable doubt, that Dolan committed the aggravated sexual assaults of A.S. and N.G. as alleged in the indictments. We conclude that the evidence is legally and factually sufficient to support the jury's verdict, and we overrule Dolan's first issue.

Outcry Witnesses

In his second issue, Dolan argues that the trial court's designation of Prihoda as the proper outcry witness for A.S. and Rupert as the proper outcry witness for N.G. violated the "first person" provisions of Article 38.072 of the Texas Code of Criminal Procedure. Dolan contends that Article 38.072 "requires that the proffered outcry testimony describe the offense 'in a discernible manner[,]'" and that the description of the girls' outcries to their parents were "detailed and discernible enough for them to call law enforcement and not only report but describe the nature of the alleged sexual abuse." According to Dolan, "the 'first person' provision trumps the 'best witness' practice."

Article 38.072 of the Texas Code of Criminal Procedure allows the admission of a hearsay statement made to an outcry witness by certain abuse victims, including child victims of sexual abuse younger than fourteen years of age. *See* Tex. Code Crim. Proc. Ann. art. 38.072 (West Supp. 2017). In child sexual abuse cases, designation of a person as an outcry witness allows the person to testify concerning the child's otherwise inadmissible hearsay or out-of-court statements describing the abuse. *See id.* For the outcry statement to be admissible, the witness must be the first adult to whom the child made a statement about the offense. *See id.*, § 2; *see Bays v. State*, 396 S.W.3d 580, 585 (Tex. Crim. App. 2013) ("outcry statute" contained in

20

article 38.072 "creates a hearsay exception for a child-complainant's out-of-court 'statements' that 'describe the alleged offense,' so long as those statements were made 'to the first [adult] person . . . to whom the child . . . made a statement about the offense'") (quoting Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a)(1)-(3)); *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (outcry witness is first person over age of eighteen, other than defendant, to whom child spoke about the offense).

Although the outcry statute provides that the proper outcry witness is the "first" adult to whom a child made a statement about the offense, the Court of Criminal Appeals has interpreted that provision to mean the first adult "to whom the child makes a statement that in some discernible manner describes the alleged offense." *See Garcia v. State*, 792 S.W.2d 88, 90-91 (Tex. Crim. App. 1990); *see also Michell v. State*, 381 S.W.3d 554, 558 (Tex. App.—Eastland 2012, no pet.). "[T]he statement must be more than words which give a general allusion that something in the area of child abuse was going on." *Garcia*, 792 S.W.2d at 91; *see Michell*, 381 S.W.3d at 558. If the initial statement to an adult conveyed nothing more than a "general allusion" of abuse, then the recipient of a subsequent detailed statement should be designated as the outcry witness, even though that person technically was not the first adult to whom the child revealed the offense. *See Garcia*, 792 S.W.2d at 91 (initial statement that "something had happened at home,

21

and that it had to do with child abuse[]" was "general allusion," insufficient to designate first adult as outcry witness); *Thomas v. State*, 309 S.W.3d 576, 579 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (trial court reasonably concluded that child victim's statements to her mother that only included statement that appellant used his hands to touch her was insufficient to designate mother as outcry witness because it did not include any specific details of the offense and was a "general allusion" that failed to describe the alleged offense in a discernible manner for article 38.072 purposes); *Sims v. State*, 12 S.W.3d 499, 500 (Tex. App.—Dallas 1999, pet. ref'd) (trial court could have reasonably determined that the child victim's statement to her mother that appellant "had touched her private parts" was insufficient to designate the mother as outcry witness because the statement "was nothing more than a general allusion that something in the area of sexual abuse was occurring and not a clear description of the offense charged as required by article 38.072.").

The trial court's outcry witness determination and resulting admission of hearsay testimony are reviewed under an abuse of discretion standard. *Rodgers v. State*, 442 S.W.3d 547, 552 (Tex. App.—Dallas 2014, pet. ref'd); *Robinett v. State*, 383 S.W.3d 758, 761 (Tex. App.—Amarillo 2012, no pet.) A trial court has broad discretion in determining the admissibility of the outcry evidence, and its determination as to the proper outcry witness will not be disturbed on appeal absent

22

a showing in the record that the trial court clearly abused its discretion. *Garcia*, 792 S.W.2d at 92. A trial court does not abuse its discretion if its decision is within the zone of reasonable disagreement. *See Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

Dolan cites generally to *Reed v. State*, 974 S.W.2d 838, 841 (Tex. App.—San Antonio 1998, pet. ref'd), in support of his argument that courts generally favor the parent as the first person to whom the child outcries about sexual abuse over post-arrest child abuse experts who use procedures to elicit details not made in the original outcry to the parents. Dolan's reliance on *Reed* is misplaced. In *Reed*, the trial court allowed the father of one of the child-victims to testify as the outcry witness. 974 S.W.2d at 839, 841-42. On appeal, the appellant argued that, although the outcry was first made to the father, the child victims' statements to the father were not detailed enough and that the CPS worker who interviewed the child victims was the proper outcry witness. *Id.* at 841. The San Antonio Court of Appeals concluded the trial court did not abuse its discretion in allowing the father to testify as the outcry witness pursuant to article 38.072. *Id.* at 842. In so reasoning, the San Antonio Court of Appeals explained that because the father, who was the first adult the children told about the abuse, was told by the victims how, when, and where appellant had touched them, the statements were more than general allegations of abuse and the

23

father was a proper outcry witness. *Id. Reed* does not support Dolan's contention that courts generally favor the parent as the first person to whom the child outcries about sexual abuse over post-arrest child abuse experts who use procedures to elicit details not made in the original outcry to the parents. In fact, the San Antonio Court of Appeals reiterated that the proper outcry witness under article 38.072, "[a]ccording to the court of criminal appeals, . . . is the first adult to whom the child makes a statement that 'in some discernible manner describes the alleged offense.'" *Id.* at 841 (quoting *Garcia*, 792 S.W.2d at 91).

In the present case, the trial court held a hearing outside the presence of the jury to determine proper outcry witnesses for A.S. and N.G. *See* Tex. Code Crim. Proc. Ann. art. 38.072, § 2(b)(2). We first address Dolan's argument that the trial court erred in designating Kari Prihoda, and not J.L. (A.S.'s mother), as the outcry witness for A.S. At the hearing, J.L. testified that when A.S. was about seven years old, J.L.'s sister (M.L.) messaged her saying that she had given her daughter, N.G., a bath and that N.G. told M.L. that her Uncle Peter had "touched her down there[.]" According to J.L., M.L. came over to talk about it and A.S. overheard M.L. tell J.L. what N.G. had told her. N.G. walked into the room and heard the conversation and she said that Uncle Peter touches her down there, pointed to her vagina, but gave no details. J.L. testified that then A.S. "turned and she looked at [J.L.] and said, yes, it's

24

true that her Uncle Peter 'touches us down there.'" According to J.L., A.S. said it happened three times and A.S. only discussed the three times generally. J.L. testified that A.S. told her that one of the times was on Christmas at her grandmother's house in the living room, she was sitting down with her Uncle Peter on a couch with a blanket over them, everyone was outside drinking, and Peter touched her vagina over her pants. According to J.L., A.S. did not describe who else was in the living room or what she was wearing. J.L. testified that A.S. said there was another time when Peter took A.S. and N.G. to get ice cream at Walmart, they all went into the family restroom together, N.G.'s pants were down to use the restroom, Peter touched N.G. on her vagina in front of A.S., N.G. said, "Ouch[,]" and Peter touched A.S. According to J.L., A.S. told her about a third time when she was being dropped off back at home from being with her grandmother, Peter was sitting next to her in the back seat of a car, P.J. was also in the back seat, and Peter touched A.S. in her private part. J.L. testified she did not talk to A.S. again of other details about what happened because J.L. was told to let A.S. tell the detective everything. According to J.L., A.S. told her about the three occasions in one discussion, the conversation lasted a few minutes, J.L. stopped asking A.S. questions because J.L. "didn't want to go into too much[,]" and J.L. did not feel like A.S. told her everything that had happened. J.L. testified that, in regards to the Walmart incident, A.S. did not describe how Peter

25

touched her in the restroom, did not describe what either girl was wearing, did not describe what time of day it was, and did not mention whether the girls had left the restroom before they went back in with Peter. According to J.L., out of the three instances, the only one in which A.S. mentioned what Peter touched her with was the Christmas incident when she said he touched her with his hand, but she did not say whether or not it was one finger or more, and did not talk about penetration.

Kari Prihoda testified that she met with A.S. and A.S. gave her a very detailed account of what happened. According to Prihoda, A.S. said her "Tio Peter" had been poking her in her "middle part[,]" which A.S.'s mom calls a vagina, and that it happened multiple times. A.S. told Prihoda that the last time he had touched her was "last Christmas" when they were sitting on the couch watching the television show "Good Luck Charlie[]" at her grandmother's house and Peter used a green and white polka-dot blanket to cover them. A.S. told Prihoda that Peter poked her through her underwear with his finger in her "middle part" and was touching skin and "went all the way in there[,]" and A.S. demonstrated with her index finger how he poked her, indicated that he poked her in a hole, and told Prihoda that it hurt. A.S. told Prihoda that Peter did not say anything. A.S. told Prihoda she was wearing a My Little Pony shirt, black pants, and underwear that had a panda on them. A.S. told her that Peter then went into the room where Aunt Della sleeps. As for the Walmart incident, A.S.

26

told Prihoda that they had gone to get ice cream and that the touching happened not in a family restroom but a girl's restroom with stalls. A.S. reported to Prihoda that after A.S. and N.G. used the restroom, Peter instructed them to go back inside the restroom, he and A.S. were standing, he first pulled down A.S.'s shorts and underwear and then N.G.'s pants and underwear, and then he poked them. A.S. told Prihoda that A.S. was wearing shorts with flowers on them and underwear with stars on them, that N.G. was wearing black pants, a panda shirt, and underwear with rainbows on them, and that Peter was wearing a grey jacket and black pants. A.S. explained to Prihoda that Peter poked her in a hole with his finger. According to Prihoda, A.S. said that N.G. had been smiling before he poked N.G. but after she saw Peter poke N.G., N.G. made a "mean face[]" and said "ouch[]" and "stop." As to the incident in the car, A.S. told Prihoda that A.S. was leaving her grandmother's house and was sitting in the back seat with Peter and P.J. A.S. told Prihoda that A.S.'s grandmother and Aunt Della were sitting in the front. A.S. said that P.J. was sleeping, and that while the car was in motion, Peter poked A.S. with his finger on top of the skin "in there again[,]" and then he said "done." A.S. told Prihoda that on the day of the car incident A.S. was wearing shorts with sparkles and a shirt with a cat and a little boy on it. A.S. told Prihoda that no one else besides Peter had touched her and that on one occasion, when she was in the room with him and she was

27

drawing a ladybug, he told her that he was the only one that could touch her. Prihoda testified that when she asked A.S. if there was anyone she did not feel safe around, A.S. answered, "just him."

On this record, we cannot say that the trial court abused its discretion in concluding that Prihoda, rather than J.L., was the first adult to whom A.S. described the offenses in a discernible manner. Although A.S. told J.L. that Peter had touched her vagina on three occasions, J.L. testified at the hearing that A.S. only told her what Peter touched her with for one of the occasions, A.S. did not give details about that touching, and that A.S. did not talk about penetration. The charges against Dolan as to A.S. alleged penetration and the statements made by A.S. to Prihoda indicated penetration for the charged offenses. Also, J.L. acknowledged at the hearing that she intentionally did not ask A.S. questions about the details because she was told to let A.S. tell the detective everything. Therefore, it would not be outside the zone of reasonable disagreement for the trial court to find A.S.'s statements to J.L. were merely general allusions that something in the area of child abuse was going on. *See Garcia*, 792 S.W.2d at 91. The trial court could have reasonably concluded that Prihoda was a proper outcry witness as to A.S. for the charged offense because A.S.'s statements to Prihoda described the details of how, when, and where the abuse occurred. *See, e.g.*, *Michell*, 381 S.W.3d at 559-60 (child's statements to police that

28

her "mom made her put her hands up in her," "her dad put his middle part up in her[,]" her parents "touched her in her private areas" and that her "dad put[] his male parts inside of her[]" were general allusions to sexual abuses whereas child's statement to forensic interviewer provided the "how, when, and where" of the abuse; thus, the trial court did not abuse its discretion designating forensic interviewer as outcry witness); *Sims*, 12 S.W.3d at 500 (counselor proper outcry witness where complainant told mother that defendant "had touched her private parts[]" but later told counselor how, when, and where appellant had touched her).

We next address Dolan's argument that the trial court erred in designating Ilda Rupert, and not M.L. (N.G.'s mother), as the outcry witness for N.G. At the hearing M.L. testified that she was giving N.G. a bath and "washing her body down there, and [N.G.] was saying that it tickled or that it seemed like it tickled." M.L. testified she asked N.G., "Does anybody play with you down there?" and N.G. responded, "Yes." According to M.L. when she asked "Who?[,]" N.G. said, "Pear[,]" which is how N.G. refers to Peter. M.L. testified she was shocked and asked, "Uncle Peter?" and N.G. responded, "Yes." According to M.L., N.G. told her that Peter "plays with her down there," and pointed to her private area, which she calls her "[k]a-ka." M.L. testified that she intentionally did not ask N.G. any more questions because M.L.

29

"wanted someone else to take over that[,]" and that N.G. did not ever indicate where N.G. was when the touching occurred.

Ilda Rupert testified at the hearing that she met with N.G. on January 30, 2017, when N.G. was four years old. N.G. told Rupert that Dolan touched N.G. with his hand, N.G. pointed to her vaginal area to show where he touched her, N.G. indicated with her right hand with a back-and-forth motion how Dolan touched N.G., N.G. explained it happened at Mo-Mo's house in the green room, and stated that she was in the bed with Dolan and P.J. and that the lights were off. N.G. drew how they were situated on the bed and the drawing was admitted into evidence. Rupert testified that, to her knowledge, the discussion she had with N.G. was the first time N.G. had ever gone into that much detail about what had happened and Rupert was the first person to whom N.G. made a detailed outcry statement.

Considering the testimony at the hearing, we cannot say that the trial court abused its discretion in finding that Rupert, rather than M.L., was the first adult to whom N.G. described the offenses in a discernible manner. Additionally, it would not be outside the zone of reasonable disagreement for the trial court to find N.G.'s statements to M.L. were merely general allusion[s] that something in the area of child abuse was going on. *See Garcia*, 792 S.W.2d at 91. The trial court could have reasonably concluded that Rupert was a proper outcry witness as to N.G. for the

30

charged offense because N.G.'s statements to Rupert described in sufficient detail how, when, and where the abuse occurred. *See, e.g.*, *Michell*, 381 S.W.3d at 559-60; *Sims*, 12 S.W.3d at 500. Issue two is overruled.

Alleged Impermissible Evidence

In his third issue, Dolan argues that "[b]y allowing the State to continuously ask the same question, or to ask additional leading questions, the trial court improperly allowed the State to question N.G. until it got the answer it wanted." According to Dolan, he was harmed by the trial court's refusal to sustain Dolan's objection to the impermissible questioning. Dolan argues that "No reasonable jury should have convicted appellant on the testimony and evidence presented in court; had the trial court properly sustained the repeated objections to this testimony, a reasonable jury would have had an even harder time finding appellant guilty."

The line of questioning and testimony on direct examination of N.G. that Dolan complains of is as follows:

> [Prosecutor:] All right. Now, [N.G.] - -
>
> [N.G.:] What?
>
> [Prosecutor:] - - has anyone ever done anything to your ka-ka that you didn't like?
>
> [N.G.:] No.

[Prosecutor:] Okay. Has anyone ever touched you somewhere on your body where you didn't want them to touch you?

[N.G.:] No.

[Prosecutor:] If I show you State's 64 - -

[N.G.:] Yeah.

[Prosecutor:] - - and that's that picture we just looked at - -

[N.G.:] Uh-huh.

[Prosecutor:] - - and ask you has anyone ever touched your ka-ka?

[N.G.:] No.

[Prosecutor:] Okay. Let's talk a little bit about your family.

. . . .

[Prosecutor:] All right. So do you remember if anyone has touched your ka-ka and you did not want them to?

[N.G.:] No.

[Defense counsel:] Objection, Your Honor, it's been asked and answered several times.

THE COURT: Overruled at this point.

[Defense counsel:] And it's leading, Your Honor. I'm sorry.

THE COURT: Overruled. You may answer the question.

[Prosecutor:] Do you remember coming to my office?

32

[N.G.:] Yeah.

[Prosecutor:] And do you remember talking to me about some stuff?

[N.G.:] Uh-huh.

[Prosecutor:] Is that a "yes"?

[N.G.:] Yeah.

[Prosecutor:] What did we talk about?

[N.G.:] [Inaudible.]

[Prosecutor:] I'm sorry?

[N.G.:] [Inaudible.]

[Prosecutor:] Can I come closer, Judge?

THE COURT: Yes.

[Prosecutor:] What did you say?

[N.G.:] I just didn't remember.

[Prosecutor:] "I just didn't remember" or "I just remembered"?

[N.G.:] I don't remember.

[Prosecutor:] You don't remember. Okay. You didn't remember. All right. Did you ever tell me - - do you ever remember telling me - -

[Defense counsel:] Objection, Your Honor, this is leading.

[Prosecutor:] Your Honor, I would ask - -

33

THE COURT: Overruled at this time. Finish the question.

[Prosecutor:] Do you remember telling me that someone had touched your ka-ka?

[Defense counsel:] Objection - -

[N.G.:] Yes.

[Defense counsel:] - - Your Honor, it's leading.

THE COURT: Overruled, Counsel.

[Prosecutor:] What was your answer?

[N.G.:] Yes.

[Prosecutor:] And who did you tell me had touched your ka-ka?

[N.G.:] My Uncle Peter.

N.G. further testified that Dolan was in the same room with N.G. and her cousin P.J. when he touched the "[i]nside" of N.G.'s "ka-ka" with his finger in the green room at her grandmother's house, and N.G. demonstrated for the jury by making a back-and-forth motion with her hand how Dolan had touched her.

"A leading question is one which suggests the desired answer or puts words into the witness's mouth to be echoed back." *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 307 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "A question which calls for the answer yes or no is not therefore necessarily leading; it must go further and suggest which of said answers is desired

34

or what answer is expected." *Hodges v. State*, 299 S.W. 907, 908 (Tex. Crim. App. 1927); *accord Newsome v. State*, 829 S.W.2d 260, 269 (Tex. App.—Dallas 1992, no pet.) ("The mere fact that a question may be answered by a simple 'yes' or 'no' will not render it an impermissibly leading question.").

The Rules of Evidence discourage, but do not forbid, the use of leading questions. *See* Tex. R. Evid. 611(c). Leading questions "should not be used on direct examination except as necessary to develop the witness's testimony." *Id.* Nevertheless, a trial court may exercise its "sound discretion" to permit leading questions. *See Wyatt v. State*, 23 S.W.3d 18, 28 (Tex. Crim. App. 2000) (explaining that the evidentiary rule "clearly contemplates that some leading questions are acceptable at the trial court's discretion"); *Padilla v. State*, 278 S.W.3d 98, 106 (Tex. App.—Texarkana 2009, pet. ref'd). "Our evidentiary rules also bestow the trial court with wide latitude in controlling the manner and mode of interrogating witnesses so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." *Padilla*, 278 S.W.3d at 106 (citing Tex. R. Evid. 611(a)). "In cases dealing with child witnesses, the rule against leading questions is somewhat relaxed." *Clark v. State*, 952 S.W.2d 882, 886 (Tex. App.—Beaumont 1997, no pet.) (citing *Moon v. State*, 856 S.W.2d 276, 279 (Tex. App.—

Fort Worth 1993, pet. ref'd)); *see also Padilla*, 278 S.W.3d at 106. "The asking of leading questions is seldom a ground for reversal (especially where a child is testifying)." *Uhl v. State*, 479 S.W.2d 55, 57 (Tex. Crim. App. 1972).

N.G. was five years old at the time of her testimony and was testifying to an event that she had witnessed when she was younger. According to the prosecutor's statement on the record, N.G. was to begin her testimony earlier that morning but the State had to call a different witness instead because N.G. "would not come in the courtroom." During her testimony, the prosecutor asked N.G. what was wrong and N.G. answered "I want my Tia." The trial court then offered N.G. water and asked her to take deep breaths. Defense counsel offered that "a short break would be good for [N.G.]" before starting cross-examination and the prosecutor disagreed, stating that if N.G. left the courtroom "she may not come in the courtroom . . . I know she's upset[,] but I would ask that we persevere since we actually have her strong enough to come in the courtroom at this moment."

Even assuming without deciding that the questions by the prosecutor were leading, the trial court here could have reasonably allowed the questioning after considering the young age of the witness, her reluctance in testifying, her age at the time of the alleged offense, and her difficulty in remembering the events to which she was testifying. *See Padilla*, 278 S.W.3d at 106 (no abuse of discretion by trial

36

court in allowing leading questions where record reflected child victim was reluctant to testify, was having trouble remembering events that had occurred over a year before trial, and was overcome with emotion); *Clark*, 952 S.W.2d at 886 (no abuse of discretion when State asked the "troubled" and "young" victim leading questions). In regards to her inconsistent testimony, contradictions in the evidence are reconciled by the jury and will not result in reversal so long as there is enough credible testimony to support the verdict. *See Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982). On this record, we cannot say the trial court abused its discretion or acted outside the zone of reasonable disagreement by overruling defense counsel's objections and in allowing the prosecutor's questioning of the young witness. Issue three is overruled.

Having overruled all of Appellant's issues, we affirm the trial court's judgments.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 21, 2018
Opinion Delivered July 25, 2018
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.